1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

| | |
|---|---|
| CHRISTOPHER WALKER, an individual,<br><br>          Plaintiff,<br><br> v.<br><br>DANIEL L. BARNETT and SHERRI MILLER BARNETT, and the marital community comprised thereof; AVIARA CAPITAL PARTNERS, LLC, a California limited liability company, HEALTH PROFESSIONALS ALLIANCE, a Delaware Corporation; BE HOLDINGS, LLC, an Oregon limited liability company; BE CAPITAL PARTNERS LLC, an Oregon limited liability company.<br><br>        Defendants. | Case No.<br><br>COMPLAINT |

COMES NOW, Plaintiff, Chris Walker, and for causes of action against Defendants, alleges as follows:

### I. PARTIES AND JURISDICTION

  1.  Plaintiff Christopher Walker ("Walker" or "Plaintiff") is an individual who resides in Clark County, Nevada.

  2.  Defendant Daniel Barnett ("Barnett") and Sheri Miller Barnett ("S. Barnett") are a marital community that entered into the subject contracts with Walker in King County, Washington but have now moved to Flagler County, Florida. All acts done by Barnett were done for and on behalf of S. Barnett and their marital community.

  3.  Defendant Aviara Capital Partners, LLC ("Aviara,") is a California corporation doing business in Washington.

COMPLAINT - 1

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ✦ Fax: (425) 450-0728

Exhibit 1
Page 1 of 33

4.      Defendant Health Professionals Alliance ("HPA") is a Delaware Corporation doing business in Washington.

5.      Defendant BE Holdings, LLC ("BE Holdings") is an Oregon limited liability company doing business in Washington.

6.      Defendant BE Capital Partners, LLC ("BE Capital") is an Oregon limited liability company doing business in Washington (collectively with BE Holdings, "BE Defendants", collectively with Barnett, S. Barnett, Aviara, and BE Holdings, the "Defendants").

7.      This Court has jurisdiction over this matter as all the acts complained of occurred in Washington State.

8.      Since the agreement subject to this litigation states all disputes arising from it shall be heard in King County, Washington and further since the Defendants do business in King County, both jurisdiction and venue are proper within this Court.

## II. FACTS

9.      Walker and Barnett formed a friendship over 30 years ago.

10.     In or around September 2011, Barnett asked Walker to provide a commercial loan to help him to finance his business, Defendant Aviara. Barnett represented that Aviara was poised to generate a lot of profit, particularly if Walker would loan him the needed money because then Aviara would make a lot of money and be able to pay off the loan quickly.

11.     Barnett further assured Walker he could and would repay him personally and was willing to use his assets as personal collateral.

12.     Trusting his "friend" Barnett, Walker provided him with the requested monies even though he did not have the cash to do so. Specifically, Barnett urged Walker to withdraw monies from Walker's personal 401k account. Walker did so and sold other liquid assets in his possession. Walker withdrew the monies to provide the loan and paid the federal income taxes and other costs associated with what constituted an early withdrawal from Walker's original plans.

13.     On or about September 23, 2011, the parties signed a secured promissory note (the "First Note"). A true and correct copy of the First Note is attached hereto as Exhibit A. The First Note was secured by a Security Agreement dated September 23, 2011, which pledged all of Barnett's interest in Aviara to him (the "Security Agreement"). A true and correct copy of the Security Agreement is attached hereto as Exhibit B.

COMPLAINT - 2

ROMERO PARK P.S.
155-108th Avenue N.E., Suite 202
Bellevue, WA 98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 2 of 33

14.     Under the First Note, Walker loaned Barnett $150,000. Barnett agreed to make interest only payments beginning in February 2012, with interest accruing at twelve percent (12%) per annum. The First Note matured 7 years from the date the parties entered into it.

15.     After approximately a year Barnett ceased making timely payments and the First Note went into default. Thereafter, Barnett made payments sporadically.

16.     Under the First Note's terms, upon default, the outstanding balance became due immediately, with default interest at 24%. Thus, the First Note became due and payable, with interest accruing at 24%, on or about February 1, 2013.

17.     After the balance on the First Note was accelerated Barnett continued to make sporadic payments now and again. For example, on or around March 6, 2015, Barnett made a $500 payment on the First Note. Upon receipt of the payment Walker sent Barnett an email confirming receipt of the payment and reminding him that the total outstanding balance owed on the Note, including the accrued interest, totaled $261,153. Barnett acknowledged the email stating the balance owing and agreed to it.

18.     On or around June 22, 2015, Walker and Barnett, through his company, BE Holdings, entered into another promissory note in the principal amount of $5,000.00 (the "Second Note").

19.     Under the Second Note, Barnett and BE Holdings not only agreed to pay back this sum but agreed to provide Walker with 112,500 warrants in VRcade, Inc. ("VR") (which they represented were owned by BE Holdings), which they agreed were an additional incentive for him to make the Second Note and not bring legal action against Barnett for his default on the First Note.

20.     Under the Second Note, Walker agreed he would consider reversing the 24% compounded interest on the First Note if Barnett and BE Holdings timely did the following: a) paid back the Second note; b) paid off the outstanding accrued interest on the First Note, c) returned to making timely monthly payments on the First Note, and d) paid of the entire First Note off within one year of signing the Second Note. Barnett and BE Holdings agreed that if they did not timely satisfy all four of these conditions then the First Note would continue in its default status and compounded interest at twenty-four percent (24%) would continue to accrue until the First Note was paid in full.

21.     Barnett handwrote on the Second Note that he "agreed to the terms personally and on behalf of BE Holdings". The Second Note was signed June 22, 2015. While Barnett repaid the $5,000 loan under the Second Note, he did not satisfy conditions b, c, or d and, thus, the First Note's default status remained, and 24% compound interest continued to accrue going forward.

COMPLAINT - 3

Exhibit 1
Page 3 of 33

22.     Despite the First Note being in default, and Barnett and BE Holdings being in breach of the First Note and some of the conditions of the Second Note, they did still from time to time make payments under the First Note. For example, they made the following payments after execution of the Second Note: 1) a $2000 payment in November of 2017; 2) a $27,000 on February 4, 2021; and 3) $62,875 payment on February 25, 2021. Defendants have not made a payment on the First Note since February 25, 2021.

23.     Even after the February 25, 2021 payment Barnett's balance under the First Note had increased to $909,732. Barnett still maintained he would pay Walker.  While the Parties spent some months trying to reach a resolution, ultimately it was clear that Barnett was never going to make any more payments on the First Note, let alone pay it off. Accordingly, on November 26, 2021, Walker sent Barnett a letter saying he would take action against him if Barnett did not cure his breach. Walker tried to follow up this letter with a call. Barnett ignored him.

24.     At all times relevant to this action, Barnett owned preferred shares of Health Professionals Alliance ("HPA"). He was (and still likely is) the third-largest shareholder of HPA. Barnett promised Walker that he would sell some of his shares and use the proceeds to repay monies owed under the Note. Barnett informed Walker in a February 12, 2021 text that HPA was a healthcare pioneer and soon the company would be valued at $30 billion. Barnett effectively agreed to pledge his equity in HPA to satisfy monies owed by him to Walker under the First Note.

25.     Barnett and HPA both represented to Walker that they would set up an entity (which they referred to as 20% Plus) to raise $1,000,000 collateralized by HPA shares held by BE Holdings. Barnett created 20% Plus with the direct assistance of, and in conjunction with HPA's chairman and largest shareholder, Roy Rose ("Rose"). Barnett and Rose (on behalf of HPA) agreed that 20% Plus (and by extension Barnett) would receive 40% of all monies raised, which monies would then be paid to Walker to pay down, if not pay off, the outstanding balance on the First Note. On information and belief, Barnett and HPA successfully raised money through 20% Plus, but did not pay all of those monies to Barnett in breach of their agreement to do so.

26.     During this period HPA aided Barnett in his efforts to avoid paying Walker. Rather than pay Walker the 40% of the proceeds raised through 20% Plus' sales efforts, as promised, upon information and belief, HPA paid BE Holdings (and notably not Barnett directly, which could then be attached by Walker if Barnett would not pay it to Walker as promised by Barnett and HPA), for all

COMPLAINT - 4

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 4 of 33

monies raised from the sale of Barnett's and/or BE Holdings' equity in HPA (which were done through 20% Plus). Further, HPA paid BE Holdings for the employment services Barnett was providing to HPA, in an apparent attempt to assist Barnett in taking the position that he was "judgment proof" and was not generating any income or other monies from HPA, when this was a false statement.

27.     In a May 19, 2021 text, Barnett continued to try to persuade Walker that financing was "just around the corner", as two new business prospects would net Walker $45,000 each. No money was received by Walker from these prospects.

28.     The last conversation Walker had with Barnett was in August of 2021. Walker asked him to repay the monies owed and sell the necessary shares at HPA. Barnett changed his previous tune and told Walker he "did not own as many shares as [Walker] thinks." Upon information and belief, this is because Barnett sold some of his shares to obtain monies for personal use, which Walker was led to believe would be used to pay off the First Note. Barnett, however, did not make any such payments. Barnett threatened to file personal bankruptcy, thus preventing Walker from receiving any owed monies, as Barnett claimed he had no equity in any other entity. Barnett attempted to convince Walker that BE Holdings was his wife's company and he owed no interest in it. Yet this allegation was contradicted by the fact HPA was paying BE Holdings rather than Barnett directly.

29.     As of December 1, 2022, Barnett owes Walker $1,406,427 under the First Note. Further, Walker is entitled to attorneys' fees under the terms of the First Note.

### III. CAUSES OF ACTION

### First Cause of Action – Breach of Contract

### (Against Barnett)

30.     Walker realleges and incorporates herein by this reference the allegations contained in the foregoing paragraphs of this Complaint.

31.     Walker and Barnett entered and were bound by the terms of the First Note.

32.     Barnett breached the terms of the First Note when he ceased making timely payments in or about February 2013. Upon breach, the balance was accelerated and default interest of 24% compounded interest began to accrue.

33.     Barnett made payments intermittently until February 25, 2021, when he ceased making any further payments.

COMPLAINT - 5

ROMERO PARK P.S.
155-108th Avenue N.E., Suite 202
Bellevue, WA 98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 5 of 33

34.     The breaches of contract by Barnett were the proximate and direct cause of significant actual and consequential damages to Walker in an amount to be proven at trial, but in no way less than $1,406,427 as of December 1, 2022 plus attorneys' fees and costs.

**Second Cause of Action – Tortious Interference with a Contract**

**(Against HPA, BE Capital, and BE Holdings)**

35.     Walker realleges and incorporates herein by this reference the allegations contained in the foregoing paragraphs of this Complaint.

36.     Defendants HPA, BE Capital, and BE Holdings ("Interfering Defendants") knew of the existence of a valid contract between Barnett and Walker, namely the First Note.

37.     The First Note was in fact a valid contract.

38.     The Interfering Defendants acted in a manner which caused Barnett to further breach the terms of the First Note when HPA paid BE Holdings rather than Walker directly (or at least Barnett directly who then in turn would pay Walker) in an effort to prevent Walker from collecting monies contractually committed to be paid to Walker to reduce the balance owing under the First Note, even though sales proceeds from the equity in HPA was to be paid to Walker.

39.     The breaches of the Interfering Defendants were the proximate and direct cause of significant actual and consequential damages to Walker in an amount to be proven at trial.

**Third Cause of Action – Conversion**

**(Against all Defendants)**

40.     Walker realleges and incorporates herein by this reference the allegations contained in the foregoing paragraphs of this Complaint.

41.     Under the Security Agreement all the equity in Aviara was pledged to Walker to satisfy the amounts owing under the First Note.

42.     On information and belief Barnett, BE Holdings, and/or Aviara ("Converting Defendants") sold Aviara and/or its assets and kept the money from the sale(s), effectively converting security that belonged to Walker. This included, but was not limited to, the loan proceeds from the First Note, which Barnett and/or BE Holdings converted for their own and did not expend on behalf of Aviara.

43.     Further, on information and belief all Barnett's and/or BE Holdings' stock/equity in HPA was going to be sold and the proceeds used to pay off the First Note. At least some amount of this

COMPLAINT - 6

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 6 of 33

1 equity has been sold and/or otherwise transferred, resulting in proceeds from this sale(s)/transfer(s).
2 Rather than pay these monies/proceeds to Walker to pay down the First Note, one or more of the
3 Converting Defendants have pocketed the proceeds and have thus converted them.

4     44.    HPA agreed to partner with Barnett in raising one million dollars through the sale of
5 Barnett/BE Holding's stock in HPA. When that equity was sold, instead of transferring the proceeds to
6 Walker as Barnett and HPA promised, the proceeds instead were transferred to one or more of the
7 Converting Defendants. HPA aided and abetted in this conversion and may have even received some
8 type of remuneration for assisting in the conversion of the sales proceeds from Walker to Barnett and/or
9 one of the other Converting Defendants.

10     45.    Defendants knew or had reason to know that the monies from the sale of the equity
11 and/or assets of Aviara and BE Holdings (in HPA) belonged to Walker.

12     46.    It is unknown by Walker how much money and/or other remuneration has been received
13 from Barnett and/or BE Holdings' interests in Aviara, BE Holdings, and HPA, but all such sale
14 proceeds/remuneration belong to Walker up to the amount of $1,406,427 as of December 1, 2022.

15     47.    Defendants' taking of the above proceeds was unauthorized by Walker, and as such
16 constitutes conversion as they treated said proceeds as their own.

17     48.    As a result of Defendants' conversion of the above proceeds Walker has been damaged
18 in an amount to be proven at the time of trial, but which amount is whatever proceeds were generated
19 from Barnett and/or BE Holding's equity interests in Aviara, BE Holdings, and HPA up to $1,406,427
20 as of December 1, 2022.

21               **Fourth Cause of Action – Unjust Enrichment**
22                         **(Against Barnett)**

23     49.    Walker realleges and incorporates herein by this reference the allegations contained in
24 the foregoing paragraphs of this Complaint.

25     50.    Barnett unjustly enriched himself when he received compensation and/or other
26 remuneration for Aviara and/or its assets. The equity (and thus the assets) was pledged to Walker under
27 the Security Agreement, which includes but was not limited to the loan proceeds Walker provided to
28 Barnett under the First Note which presumably were pocketed by Barnett instead of invested in Aviara
29 as represented to him.

30

COMPLAINT - 7

Exhibit 1
Page 7 of 33

51.     Similarly, Barnett promised that some of his and/or BE Holdings' equity and/or its equity in HPA would be sold to generate monies to pay off the First Note – the Defendants effectuated these transactions yet the Converting Defendants kept all of the proceeds.

52.     Principles of fairness and equity support Barnett (and/or whichever Defendants received any compensation/remuneration of any kind for Barnett/BE Holdings' equity that was pledged to pay down the First Note), together with any sales proceeds generated from the Defendants through the 20% Plus HPA equity sale program disgorging any proceeds and paying them to Walker to pay down the First Note.

### Fifth Cause of Action – Alter Ego/Pierce Corporate Veil
### (Against Barnett)

53.     Walker realleges and incorporates herein by this reference the allegations contained in the foregoing paragraphs of this Complaint.

54.     Barnett ran BE Holdings in such a manner that it ceased to be a separate legal entity. On information and belief, Barnett had what should have been his personal stock in HPA (since he received this stock as part of being an employee of HPA) instead titled in the name of BE Holdings, which Barnett recently told Walker purportedly does not belong to "him" but rather "belongs to his wife," in an apparent attempt to insulate BE Holdings from being liable to Walker for the monies owed under the First Note. Even though Barnett worked for HPA and received compensation and stock in HPA as part of his employment with HPA, Barnett and HPA nonetheless had all compensation and stock put in the name of BE Holdings, in an apparent attempt to try to shield these monies and HPA stock from Walker. These actions of placing wages and HPA equity into BE Holdings when it was earned/procured by Barnett is evidence that BE Holdings' veil should be pierced, and it should also be considered the alter ego of Barnett and be equally liable for all sums owing under the First Note.

55.     Barnett used BE Holdings' corporate form to evade duties owed to Walker.

56.     The corporate veil of BE Holdings should be pierced, and personal liability imposed on BE Holdings under the First Note, because it is necessary to prevent an unjustified loss to Walker.

### Sixth Cause of Action - Constructive Trust
### (Against Barnett, BE Holdings, and BE Capital Partners)

57.     Walker realleges and incorporates herein by this reference the allegations contained in the foregoing paragraphs of this Complaint.

COMPLAINT - 8

ROMERO PARK P.S.
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ✦ Fax: (425) 450-0728

Exhibit 1
Page 8 of 33

58.     Barnett pledged all the stock in Aviara to Walker to secure payments under the First Note (which includes all the loan proceeds from the First Note that Barnett represented were going to be put into Aviara). Barnett pledged that he/BE Holdings would sell their stock in HPA to generate sales proceeds to pay off the First Note. Barnett and HPA represented that they were doing a money raise of $1million, with the proceeds being given to Walker to pay down the First Note. All of the proceeds from these transactions, and any other similar ones where Barnett and/or a company he and/or his wife "owns/controls" has sold any of the equity and/or assets of any of the other Defendants, should be ordered by this Court as being held in constructive trust for the benefit of Walker.

## IV.  REQUEST FOR RELIEF

WHEREFORE, Walker respectfully requests relief against Defendants, jointly and severally, as follows:

A.     For judgment against Defendants in an amount to be proven at the time of trial but which amount is $1,406,427 as of December 1, 2022;

B.     For all monies from the sale of any of Barnett's and/or his wife's companies/assets pledged and/or committed to Walker as security to pay down the First Note to be placed into the Court Registry for ultimate disbursement to Walker.

C.     That the corporate veil of BE Holdings be pierced and/or be determined as being the alter ego of Barnett, thus making BE Holdings liable to Walker for all amounts to which Barnett is liable to Walker;

D.     For Walker's costs and expenses herein, including reasonable attorney fees, as set forth in the First Note; and

E.     For such other and further relief as the Court may find just and equitable in the circumstances.

DATED this 3rd day of January, 2023.

ROMERO PARK P.S.

H. Troy Romero, WSBA #19044
155 – 108th Avenue NE, Suite 202
Bellevue, WA  98004
(425) 450-5000 telephone
(425) 450-0728 facsimile
tromero@romeropark.com

COMPLAINT - 9

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 9 of 33

1

Attorneys for Plaintiff

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

COMPLAINT - 10

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 10 of 33

# Exhibit A

Exhibit 1
Page 11 of 33

## SECURED PROMISSORY NOTE

**DATE:** September **23**, 2011                                                    Bellevue, Washington

FOR VALUE RECEIVED, Daniel L. Barnett, an individual located at 624 Atwater Road, Lake Oswego, Oregon 97034 ("**Borrower**"), unconditionally promises to pay to the order of _Christopher Walker and/or assigns located at *P.O. Box 517 Medina WA 98039* ("**Holder**"), the principal sum of the principal amount outstanding hereunder, as conclusively evidenced on Schedule A attached hereto as "Advances and Payments of Principal," together with interest at the rate, and payable on the other terms and conditions, set forth below.

This Note is being issued to Holder pursuant to the terms of that certain Term Sheet dated September 19, 2011 between the Borrower and Holder (the "**Term Sheet**"), in connection with secured debt financing from the Holder to the Borrower in an amount of two hundred thousand dollars ($200,000). The obligations due under this Note are secured by the Security Agreement dated of even date herewith (the "**Security Agreement**") executed by the Borrower for the benefit of the Holder. Additional rights of the Holder are set forth in the Security Agreement.

**1. Note Principal; Schedule A.** The total loans in the aggregate from Holder under this Note shall not exceed $200,000, of which $50,000 is being advanced to the Borrower as of the date of this Note from Holder, $50,000 will be advanced from Holder to Borrower on November 1, 2011 and $100,000 shall be advanced from Holder to Borrower on November 15, 2011. Upon the Borrower making any payment of principal hereunder, the Holder shall and is authorized to enter and record on Schedule A the amount of each payment of principal. The aggregate "Principal Amount Outstanding" shown on Schedule A shall be prima facie evidence of the principal amount owing and unpaid on this Note. The failure to record the date and amount of any advance on Schedule A shall not, however, limit or otherwise affect the obligations of the Borrower under this Note to repay the principal amount of the advance together with all interest accruing thereon.

**2. Interest.**

(a) <u>Interest Rate</u>. All outstanding principal under this Note shall bear interest at an interest rate of 12.0% per annum, calculated on a 365/6-day basis and the actual number of days elapsed. Upon and during the occurrence of an Event of Default, the outstanding principal on this Note shall bear interest at a default rate of interest of 24% per annum (the "**Default Rate**"). Interest shall never exceed the maximum lawful rate of interest applicable to this Note.

(b) <u>Monthly Payments of Interest</u>. The Borrower shall make monthly payments of accrued and unpaid interest only, beginning on February 1, 2012, and on the first business day of each consecutive calendar month thereafter.

(c) <u>Additional Bonus Interest</u>. In the event that Borrower receives gross income (such as finder's fees, closing fees), distributions, dividends or any other money (collectively, "Aviara Income") from his position as Managing Member and/or as an owner in Aviara Capital Partners, LLC ("**Aviara**") from the date of execution of this Note and continuing until the end of the term of this Note, Borrower shall promptly pay to Holder an amount equal to the sum of $x - y$, where $(x)$ equals twenty five percent (25%) of such compensation, and $(y)$ equals the interest paid under paragraph 2(a) above (the sum of which is referred to herein as "**Bonus Interest**"). The Bonus Interest will be calculated and paid on a running cumulative basis such that at the time of any payment of Bonus Interest the total cumulative Bonus Interest paid shall not exceed $x - y$ for the period of February 1, 2012 through the time of payment of the Bonus Interest. In the event that the Bonus Interest calculation results in a negative number, Borrower may apply the negative Bonus Interest to the next scheduled payment of Interest under this Note. In the event that the Bonus Interest calculation remains negative on the Maturity Date of this Note, it shall be written off by Borrower. Notwithstanding the above Borrower shall pay Holder twenty five percent (25%) of any and all Aviara Income he receives from the date of this Note until February 1, 2012 and said amount shall NOT be subject to any reduction for interest paid. Payment for this period of Bonus Interest shall be made in two installments: the first shall be paid on January 1, 2012 for all Bonus Interest earned from the date of this Note through the end of 2011. The second shall be paid on February 1, 2012 for all Bonus Interest earned from January 1, 2012 through January 31, 2012.

1

Exhibit 1
Page 12 of 33

### 3. Payments and Conversion Rights

(a) <u>Maturity Date</u>. Unless earlier paid in full pursuant to the terms of this Note, the entire unpaid principal sum of this Note, together with accrued and unpaid interest and Bonus Interest thereon, shall become immediately due and payable on the seven (7) year anniversary of the date of this Note, as written on the top of this Note (the "**Maturity Date**").

(b) <u>Payment Method</u>. Interest, Bonus Interest and principal payments shall be sent by U.S. postal mail to Holder at Holder's registered address and shall be postmarked no later than the due date for the payment, or may be sent by wire transfer to Holder's bank as specified by Holder. In the event that a payment is lost or not received by Holder, upon notification by Holder the Borrower will promptly issue a stop payment on the check and wire transfer Holder the required payment.

(c) <u>Conversion Rights</u>. Holder may convert all (but not less than all) of the principal amount hereunder at any time, without prior notice or the consent of Borrower, into Class D units of interest in Aviara equal to twenty five percent (25%) of the amount of ownership in Aviara (in any class of units) owned by Borrower at the time of conversion by Holder. Borrower agrees that he will not sell, assign, hypothecate, pledge or otherwise dispose of any of the Aviara ownership that he owns as of the date of this Note and as represented in Exhibit B hereto.

(c) <u>Prepayments</u>. The Borrower may prepay all or any part of the principal amount, together with any accrued and unpaid Interest and Bonus Interest hereunder, at any time or from time to time, with 30 days prior written notice to Holder. Upon notice hereunder Holder may elect to accept such prepayment or may elect to exercise his conversion rights.

(d) <u>Lawful Funds</u>. All payments on this Note shall be in lawful money of the United States of America in immediately available funds. All payments made on this Note shall be applied first against accrued and unpaid interest, then against Bonus Interest, and then against principal. Whenever any payment to be made hereunder is due on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time will be included in the computation of interest due hereunder. "**Business Day**" means any day that is not a Saturday, a Sunday or any other day on which banking institutions in the State of Washington are authorized or required by law or other government action to close.

### 4. Events of Default.

(a) Each of the events specified in this Section 4 shall constitute an event of default (the "**Event of Default**"):

(i) failure to pay any required principal repayment on this Note when due or failure to pay any interest or Bonus Interest on this Note within 10 days of the date upon which such payment is due;

(ii) any material breach of representations, warranties or covenants made by the Borrower to the Holder in the Note, or Security Agreement, which remains uncured for a period of 30 days after written notice of the breach is provided by the Holder to the Borrower;

(iii) the institution of proceedings by or against (which has not been stayed or dismissed within 90 days following the filing of such petition) the Borrower under any provisions of the federal Bankruptcy Act or any other applicable federal or state law to be adjudicated as bankrupt or insolvent; the appointment of a receiver, liquidator or trustee; an assignment for the benefit of creditors of the Borrower; the Borrower files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect;

(iv) if any final judgment, writ or warrant of attachment in an amount greater than $10,000 is filed against the Borrower or its assets and remains unbonded, uninsured or unstayed for 120 days;

(v) if Borrower dies or is deemed to be mentally incapacitate by a court of law;

(b) Upon the occurrence of and during the continuance of an Event of Default, the Holder, pursuant to a written notice executed by the Holder and delivered to the Borrower, may, in its sole and absolute discretion, declare the outstanding principal amount and accrued but unpaid interest and Bonus Interest immediately due and payable, and thereafter the Holder may exercise any and all remedies available under the Security Agreement or available at law or in equity. In the case of any Event of Default under this Note by the Borrower which is continuing and has not

2

Exhibit 1
Page 13 of 33

been waived in writing by Holder, this Note will bear interest at the Default Rate.

**5. Representations and Warranties of the Borrower.** The Borrower hereby represents and warrants that:

(a) Corporate Power and Capacity. The Borrower has all requisite power and authority to execute and deliver this Note and to carry out and perform its obligations under the terms of this Note.

(b) Authorization. All corporate action on the part of Aviara, its directors and its stockholders necessary for the authorization, execution, issuance, delivery and performance of this Note by the Borrower and the performance of the Borrower's obligations hereunder has been taken.  The Note, when executed and delivered by the Borrower, shall constitute valid and binding obligations of the Borrower enforceable in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors.

(c) No Violations. The execution, delivery and performance by the Borrower of this Note and the compliance with the provisions hereof and thereof by the Borrower does not violate, conflict with or constitute or result in a breach or default under (or an event which with notice of passage of time or both would constitute a default) or give rise to any right of termination, cancellation or acceleration under, or result in the creation of any Encumbrance (as defined below) upon any properties or assets of the Borrower under (i) the Articles of Organization or bylaws of Aviara, (ii) applicable law, statute, rule or regulation, or any ruling, writ, injunction, order, judgment or decree of any court, arbitrator, administrative agency or other governmental body applicable to the Borrower or any of its properties or assets or (iii) any contract or agreement affecting the Borrower, except, with respect to clauses (ii) and (iii), in each case, where such violation, conflict, breach, default, termination, cancellation, acceleration or Encumbrance would not, individually or in the aggregate, have a material adverse effect on the Borrower.  As used herein, the term "Encumbrance" shall mean any lien, charge, encumbrance, equity, claim, option, proxy, pledge, security interest, or other similar right of any nature other than statutory liens securing payments not yet due and payable or due but not yet delinquent.

(d)  No dilution.  Borrower represents that there are 10,000,000 units in Aviara.  Borrower represents that all 10,000,000 units have been issued and that Aviara does not have any units in the company treasury of any class. Borrower represents that he currently owns 3,635,000 units, which is 36.46% of Aviara.  If Holder were to exercise his conversion rights on the date of this Note Holder would receive 908,750 Units. Borrower represents that Aviara will not issue additional Units and if it does he represents that he will make sure that Holder owns 9.115% of Aviara (25% of Borrower's 36.46% of Aviara).

(e)  Class D Units.  Borrower represents that Class D units are identical to Class A units except that Class D units are non-voting units.  Borrower further represents that in the Aviara Operating Agreement anytime there is a reference to Class A Units it also refers to Class D Units (i.e. they are considered the same) except for any provision concerning voting or control of Aviara.

(f)  No violation of Article 6 of the Aviara Operating Agreement.  Borrower represents that Aviara's Operating Agreement is entered into on July 30, 2010 and is the only operating agreement of the company (the "Operating Agreement").  Borrower represents that if Holder exercises his conversion rights set forth herein that in doing so it will not be a violation of Article 6 of the Operating Agreement (or any other provision in the Operating Agreement) and that Holder will not be required to wait for any permissions from the company or any member of the company (i.e. his Class D Units will be immediately issued to him personally about exercising his conversion rights).

**6. Representations and Warranties of Holder.** Holder hereby represents and warrants that:

(a)  Holder understands and agrees that the Note has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and are being offered and sold by the Borrower to Holder in reliance upon an exemption from registration provided by Rule 506 of Regulation D under the Securities Act.

(b)  Holder is an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act, as set forth below, and is purchasing the Note for its own account for investment and not with a view to any resale, distribution or other disposition of the Note or any part thereof in any transaction that would be in violation of the securities laws of the U.S. or any state thereof.

(c)  Holder has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the investment and is able to bear the economic risk of loss of the investment.  Holder is aware of the Borrower's financial condition, and has received all information from the Borrower that it has considered

3

Exhibit 1
Page 14 of 33

necessary in connection with its decision to invest in the Note.

(d) Holder is a resident of the State of Washington and the solicitation of the Note herein took place within the State of Washington.

**7. Secured Obligations.** This Note shall be secured by a security interest on all of the assets of the Borrower, which lien shall be created by the Security Agreement. The Holder shall have recourse to the assets to satisfy the Borrower's obligations hereunder. Such security interest shall terminate upon payment in full of the debt owed under this Note. As additional security Borrower shall name Holder as a beneficiary on a life insurance policy of at least $200,000 on Borrower's life. The insurance company must be a reputable insurance company and a copy of the policy, together with proof that Holder is listed as a beneficiary, must be provided to Holder before he makes the second $50,000 installment. Borrower may direct the insurance company to delete Holder as a beneficiary under said policy once the Note has been paid in full or Holder has exercised his conversion rights.

**8. Transfer of Note; Restrictions on Transfer.** This Note may be transferred only in compliance with applicable federal and state securities laws and only upon surrender of the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form reasonably satisfactory to the Borrower except that Holder may transfer the Note to his wholly owned corporation or limited liability company. A new Note for like principal amount and interest will be issued to, and registered in the name of, the transferee. Interest and principal are payable only to the registered holder of the Note. The Holder agrees, by accepting this Note, to provide a Form W-9 to the Borrower upon request.

**9. Miscellaneous.**

(a) Holder as Owner. The Borrower may deem and treat the holder of record of this Note as the absolute owner for all purposes regardless of any notice to the contrary from third parties.

(b) Notices. Unless otherwise provided, any notice under this Note shall be given in writing and shall be deemed effectively delivered (i) upon personal delivery to the party to be notified, (ii) upon confirmation of receipt by fax by the party to be notified, (iii) one business day after deposit with a reputable overnight courier, prepaid for overnight delivery, or (iv) three days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested. The address for any such party shall be the principal office of such party as set forth in the first paragraph of this Note or at such other address as such party may designate by ten days advance written notice to the other party given in the foregoing manner.

(c) Amendments and Waivers. Any term of this Note may be amended and the observance of any term may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Borrower and the Holder.

(d) Severability. If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note, and the balance of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

(e) Successors and Assigns. The terms and conditions of this Note shall inure to the benefit of and be binding on the respective successors and permitted assigns of the parties.

(f) Waivers. The Borrower waives presentment, demand, protest and notice of dishonor. No single or partial exercise by Holder, or delay or omission in the exercise by Holder of any right or remedy under this Note or the Security Agreement shall preclude, waive or limit any other or further exercise thereof or the exercise of any other right or remedy.

(g) Collection Expenses; Attorney's Fees. Upon any default by the Borrower hereunder, the Holder may employ an attorney to enforce the Holder's rights and remedies and the Borrower hereby agrees to pay to the Holder its reasonable attorneys fees, plus all other reasonable expenses incurred by the Holder in exercising any of the Holder's rights and remedies upon default.

(h) Expenses. Each of the Borrower and Holder shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of Note, the Security Agreement and related agreements.

(i) Governing Law; Jurisdiction; Venue. This Note shall be governed by and construed under the laws of the state

4

Exhibit 1
Page 15 of 33

of Washington without regard to principles of conflict of laws. The parties irrevocably consent to the jurisdiction and venue of the state and federal courts located in King County, Washington in connection with any action relating to this Note.

BORROWER:

By: _____

Name:    Daniel Barnett

HOLDER:

By: _____
Name: CHRISTOPHER WALKER
Title:

5

Exhibit 1
Page 16 of 33

# Exhibit B

Exhibit 1
Page 17 of 33

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "**Agreement**") is entered into as of September 23, 2011, by and between Daniel L. Barnett, an individual (the "**Borrower**"), and Christopher Walker and/or assigns who has executed a copy of this Agreement and a Secured Promissory Note with the Borrower ("**Lender**").

A. Pursuant to that certain Term Sheet dated as of September 19, 2011 (the "**Term Sheet**"), Lender has agreed to provide for debt financing to Borrower in an amount of $200,000 on the terms and subject to the conditions therein (the "**Loan**").

B. Lender desires to make an initial advance to the Borrower under the Loan, pursuant to a secured promissory note of even date herewith (the "**Secured Promissory Note**"), and the Borrower has agreed, for the purpose of securing payment of the Loan, to grant Lender a first priority security interest in the Borrower's assets as defined herein.

For good and valuable consideration, receipt and adequacy of which are hereby admitted and acknowledged, the parties hereto agree as follows:

## 1. Grant of Security Interest.

In order to secure the payment of any monies due to Lender under the Secured Promissory Note (the "**Obligations**"), the Borrower hereby grants to Lender and its successors and assigns, a first priority security interest in all of the Collateral (defined below). This security interest shall be subject to the terms and conditions of this Security Agreement.

## 2. Collateral

The "Collateral" subject to this Security Agreement means all of the Borrower's right, title and interest in, to and under all of the Borrower's ownership in Aviara Capital Partners, LLC ("Aviara"), whether now owned or existing or hereafter acquired or arising and all additions, accessions and substitutions thereto or therefore.

## 3. Rights and Remedies upon Event of Default.

(a) Upon the occurrence, and during the continuation, of an Event of Default (as defined in the Secured Promissory Note), Lender (at its election but without notice of its election and without demand) may, except to the extent otherwise expressly provided or required below, do any one or more of the following, all of which are authorized by the Borrower.

(i) Proceed directly and at once, without notice, against the Borrower to collect and recover the full amount or any portion of the Obligations, or against any security or collateral for the Obligations

(ii) May exercise in respect of the Collateral, in addition to other rights and remedies provided for herein and in the Note or otherwise available to it, all the rights and remedies available to it at law or in equity;

(iii) Without notice or demand, make such payments and do such acts as Lender considers necessary or reasonable to protect its security interest in the Collateral.

(iv) Sell all or any part of the Collateral in a private sale to a qualified and "accredited" investor(s), by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places as is commercially reasonable and legal. It is not necessary that the Borrower be present at any such sale. The Borrower hereby agrees that 30 days' notice of any intended sale or disposition of the Collateral is reasonable. Lender shall have the right upon any such sale or sales, and, to the extent permitted by law, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in the Borrower, which right or equity is hereby waived or released to the extent permitted by law;

(v) Except as required by law, Lender may take any or all of the foregoing action without demand, presentment, protest, advertisement or notice of any kind to or upon the Borrower or any other person. The rights and remedies of

1

Exhibit 1
Page 18 of 33

Lender under this Agreement, the Note, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on the Borrower's part shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

(b) Application of Collateral Proceeds. The proceeds and/or avails of the Collateral, or any part thereof, and the proceeds and the avails of any remedy hereunder (as well as any other amounts of any kind held by Lender at the time of, or received by Lender after, the occurrence of an Event of Default) shall be paid to and applied as follows:

(i) First, to the payment of reasonable costs and expenses of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, reasonable legal expenses and attorneys' fees, incurred or made hereunder by Lender;

(ii) Second, to the payment to Lender of the Obligations (to be applied first to accrued interest and second to outstanding principal); and

(iii) Third, to the payment of the surplus, if any, to Borrower, its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

### 4. Lender's Appointment as Attorney-in-Fact

The Borrower appoints Lender, any of its officers, as its attorney-in-fact, with power and authority in the place and stead of the Borrower and in the name of the Borrower to execute such documents and to supply any omitted information and correct errors in any documents executed by the Borrower; to sign the Borrower's name on public records; and to do all other things Lender deems necessary to carry out this Security Agreement. The Borrower hereby ratifies and approves all acts of the attorney and neither Lender nor the attorney will be liable for any acts of commission or omission, nor for any error of judgment or mistake of fact or law other than gross negligence or willful misconduct.

### 5. No Waivers; Cumulative Remedies

The failure of Lender or the Borrower at any time to demand strict performance by the other of any terms, covenants or conditions set forth herein, shall not be construed as a continuing waiver or relinquishment thereof, and either party may, at any time, demand strict and complete performance by the other of said terms, covenants or conditions. The rights and remedies provided in this Agreement are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law.

## 6. Perfecting Security Interest in Collateral

Borrower owns Certificate No. 1 of Class A Units in Aviara, which represents 3,635,000 units in Aviara (the "Certificate"). Upon execution of this Agreement Borrower shall transmit the original Certificate to Holder's counsel, Troy Romero of Romero, Park & Wiggins P.S. (155 108th Ave. NE, Suite 202; Bellevue, WA 98004) ("RPW"). RPW shall place the original Certificate in its safety deposit box at the Bank of America branch in Bellevue, Washington. Upon Borrower's payment in full of his obligations under the Secured Promissory Note, or Holder's execution of his conversion rights set forth in the Secured Promissory Note (whichever occurs first), RPW shall transmit the original Certificate to Borrower. If Borrower defaults on his obligations under the Secured Promissory Note or this Agreement RPW is authorized by Borrower to transmit the original Certificate to Holder.

### 7. Liens and Encumbrances.

2

Exhibit 1
Page 19 of 33

The Borrower represents and warrants that the Borrower has good and marketable title to the Collateral, free and clear of any mortgage, pledge, lien, encumbrance, charge, or other security interest.

**8. Covenants.**

(a)  The Borrower shall not change its residency, principal place of business or its records, other than to another location in the United States of America after providing advance notice to the Lender.

(b)  The Borrower shall pay promptly when due all property and other taxes, assessments and government charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Collateral, except to the extent the validity thereof is being contested in good faith and adequate reserves are being maintained in connection therewith.

**9. Miscellaneous.**

(a) Notices. Unless otherwise provided, any notice required to be given hereunder shall be given in writing and shall be deemed effectively delivered (i) upon personal delivery to the party to be notified, (ii) upon confirmation of receipt by fax by the party to be notified, (iii) one business day after deposit with a reputable overnight courier, prepaid for overnight delivery, or (iv) three days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested.  The address for any such party shall be the address of such party as set forth on the Secured Promissory Note or at such other address as such party may designate by ten days advance written notice to the other party given in the foregoing manner.

(b) Headings. The subject headings of the paragraphs of this Agreement are included for purposes of convenience only and shall not affect the construction of interpretation of any of its provisions.

(c) Severability. In the event that any of the terms of this Agreement are held to be partially or wholly invalid or unenforceable for any reason whatsoever, such holdings shall not affect, alter, modify or impair in any manner whatsoever, any of the other terms, or the remaining portion of any term, held to be partially invalid or unenforceable.

(d) Entire Agreement; Amendments. This Agreement, together with the Term Sheet, the Secured Promissory Note, and any document or agreement entered into in connection with or contemplated by the Term Sheet, constitute the entire agreement between the parties, and contains all of the agreements between the parties with respect to the subject matter hereof.  No change or modification of this Agreement shall be valid unless the same shall be in writing and signed by Lender and the Borrower.  No waiver of any provision of this Agreement shall be valid unless in writing and signed by the person or party against whom charged.

(e) Attorneys' Fees. In the event of any action brought by either party against the other arising out of this Agreement, or for the purposes of enforcing this Agreement or collection of any damages alleged to have resulted to one of the parties by reason of the breach or failure of performance of the other, the party prevailing in any such action shall be entitled to recover reasonable attorneys' fees and cost of suit as may be determined by the court.

(f) Governing Law; Venue. This Agreement shall be governed by and construed under the laws of the state of Washington without regard to principles of conflict of laws.  The parties irrevocably consent to the jurisdiction and venue of the state and federal courts located in King County, Washington in connection with any action relating to this Agreement.

(g) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

EXECUTED by the parties hereto as of the day and year first above written.

BORROWER:

By:_____

Name:   Daniel Barnett

3

Exhibit 1
Page 20 of 33

LENDER:

By: _____

Name: CHRISTOPHER WAVER

Title:

4

Exhibit 1
Page 21 of 33

1

2

3

4

5

6

7

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

8

9

10   CHRISTOPHER WALKER, an individual,

Case No.

11                              Plaintiff,

         v.

12                                                  SUMMONS

13   DANIEL L. BARNETT and SHERRI MILLER
     BARNETT, and the marital community
14   comprised thereof; AVIARA CAPITAL
     PARTNERS, LLC, a California limited liability
15   company, HEALTH PROFESSIONALS
     ALLIANCE, a Delaware Corporation; BE
16   HOLDINGS, LLC, an Oregon limited liability
     company; BE CAPITAL PARTNERS LLC, an
17   Oregon limited liability company.

18

19                              Defendants.

20

21   TO THE DEFENDANT BE HOLDINGS, LLC:

22       1. A lawsuit has been started against you in the above-entitled court by Plaintiff.

23       2. Plaintiff's claims are stated in the written Complaint, a copy of which is served upon you

24   with this Summons.

25       3. In order to defend against the lawsuit, you must respond to the Complaint by stating your

26   defense in writing, and by serving a copy upon the lawyer signing this Summons within twenty (20)

27   days after the service of this Summons, excluding the day of service, or a default judgment may be

28   entered against you without notice. A default judgment is one where Plaintiff is entitled to what is

29   asked for because you have not responded.

30

SUMMONS - 1

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 22 of 33

1       4. If you serve a Notice of Appearance on the undersigned lawyer, you are entitled to notice

2  before a default judgment may be entered.

3       5. If not previously filed, you may demand that Plaintiff file this lawsuit with the Court. If you

4  do so, the demand must be in writing and must be served upon the person signing this Summons.

5  Within fourteen (14) days after you serve your demand, Plaintiff must file this lawsuit with the Court,

6  or the service on you of this Summons and Complaint will be void.

7       6. If you wish to seek the advice of a lawyer in this matter, you should do so promptly so that

8  your written response, if any, may be served on time.

9       7. This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of

10  Washington.

11

12           DATED this 3rd day of January, 2023.

13                    ROMERO PARK P.S.

14

15                    H. Troy Romero, WSBA #19044

16                    155 – 108th Avenue NE, Suite 202

17                    Bellevue, WA  98004

                          (425) 450-5000 telephone

18                    (425) 450-0728 facsimile

19                    tromero@romeropark.com

                          Attorneys for Plaintiff

20

21

22

23

24

25

26

27

28

29

30

SUMMONS - 2

Exhibit 1
Page 23 of 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

| | |
|---|---|
| CHRISTOPHER WALKER, an individual,<br><br>       Plaintiff,<br><br> v.<br><br>DANIEL L. BARNETT and SHERRI MILLER BARNETT, and the marital community comprised thereof; AVIARA CAPITAL PARTNERS, LLC, a California limited liability company, HEALTH PROFESSIONALS ALLIANCE, a Delaware Corporation; BE HOLDINGS, LLC, an Oregon limited liability company; BE CAPITAL PARTNERS LLC, an Oregon limited liability company.<br><br>       Defendants. | Case No.<br><br>SUMMONS |

TO THE DEFENDANT AVIARA CAPITAL PARTNERS, LLC:

 1. A lawsuit has been started against you in the above-entitled court by Plaintiff.

 2. Plaintiff's claims are stated in the written Complaint, a copy of which is served upon you with this Summons.

 3. In order to defend against the lawsuit, you must respond to the Complaint by stating your defense in writing, and by serving a copy upon the lawyer signing this Summons within twenty (20) days after the service of this Summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where Plaintiff is entitled to what is asked for because you have not responded.

SUMMONS - 1

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 24 of 33

1      4. If you serve a Notice of Appearance on the undersigned lawyer, you are entitled to notice

2 before a default judgment may be entered.

3      5. If not previously filed, you may demand that Plaintiff file this lawsuit with the Court. If you

4 do so, the demand must be in writing and must be served upon the person signing this Summons.

5 Within fourteen (14) days after you serve your demand, Plaintiff must file this lawsuit with the Court,

6 or the service on you of this Summons and Complaint will be void.

7      6. If you wish to seek the advice of a lawyer in this matter, you should do so promptly so that

8 your written response, if any, may be served on time.

9      7. This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of

10 Washington.

DATED this 3rd day of January, 2023.

ROMERO PARK P.S.

H. Troy Romero, WSBA #19044
155 – 108th Avenue NE, Suite 202
Bellevue, WA  98004
(425) 450-5000 telephone
(425) 450-0728 facsimile
tromero@romeropark.com
Attorneys for Plaintiff

SUMMONS - 2

Exhibit 1
Page 25 of 33

1
2
3
4
5
6
7
8

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

9
10
11
12
13
14
15
16
17
18
19
20

| | |
|---|---|
| CHRISTOPHER WALKER, an individual, | Case No. |
|                   Plaintiff, | |
| v. | SUMMONS |
| DANIEL L. BARNETT and SHERRI MILLER BARNETT, and the marital community comprised thereof; AVIARA CAPITAL PARTNERS, LLC, a California limited liability company, HEALTH PROFESSIONALS ALLIANCE, a Delaware Corporation; BE HOLDINGS, LLC, an Oregon limited liability company; BE CAPITAL PARTNERS LLC, an Oregon limited liability company. | |
|                   Defendants. | |

21

TO THE DEFENDANT BE CAPITAL PARTNERS LLC:

22
23

    1. A lawsuit has been started against you in the above-entitled court by Plaintiff.

24

    2. Plaintiff's claims are stated in the written Complaint, a copy of which is served upon you with this Summons.

25
26
27
28
29

    3. In order to defend against the lawsuit, you must respond to the Complaint by stating your defense in writing, and by serving a copy upon the lawyer signing this Summons within twenty (20) days after the service of this Summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where Plaintiff is entitled to what is asked for because you have not responded.

30

SUMMONS - 1

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 26 of 33

4. If you serve a Notice of Appearance on the undersigned lawyer, you are entitled to notice before a default judgment may be entered.

5. If not previously filed, you may demand that Plaintiff file this lawsuit with the Court. If you do so, the demand must be in writing and must be served upon the person signing this Summons. Within fourteen (14) days after you serve your demand, Plaintiff must file this lawsuit with the Court, or the service on you of this Summons and Complaint will be void.

6. If you wish to seek the advice of a lawyer in this matter, you should do so promptly so that your written response, if any, may be served on time.

7. This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 3rd day of January, 2023.

ROMERO PARK P.S.

H. Troy Romero, WSBA #19044
155 – 108th Avenue NE, Suite 202
Bellevue, WA  98004
(425) 450-5000 telephone
(425) 450-0728 facsimile
tromero@romeropark.com
Attorneys for Plaintiff

SUMMONS - 2

ROMERO PARK P.S.
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 27 of 33

1
2
3
4
5
6
7

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

8
9

| | |
|---|---|
| CHRISTOPHER WALKER, an individual, | Case No. |
|                     Plaintiff, | |
|    v. | SUMMONS |
| DANIEL L. BARNETT and SHERRI MILLER BARNETT, and the marital community comprised thereof; AVIARA CAPITAL PARTNERS, LLC, a California limited liability company, HEALTH PROFESSIONALS ALLIANCE, a Delaware Corporation; BE HOLDINGS, LLC, an Oregon limited liability company; BE CAPITAL PARTNERS LLC, an Oregon limited liability company. | |
|                 Defendants. | |

10
11
12
13
14
15
16
17
18
19
20

21 TO THE DEFENDANT HEALTH PROFESSIONALS ALLIANCE:

22     1. A lawsuit has been started against you in the above-entitled court by Plaintiff.

23     2. Plaintiff's claims are stated in the written Complaint, a copy of which is served upon you

24 with this Summons.

25     3. In order to defend against the lawsuit, you must respond to the Complaint by stating your

26 defense in writing, and by serving a copy upon the lawyer signing this Summons within twenty (20)

27 days after the service of this Summons, excluding the day of service, or a default judgment may be

28 entered against you without notice. A default judgment is one where Plaintiff is entitled to what is

29 asked for because you have not responded.

30

SUMMONS - 1

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 28 of 33

4. If you serve a Notice of Appearance on the undersigned lawyer, you are entitled to notice before a default judgment may be entered.

5. If not previously filed, you may demand that Plaintiff file this lawsuit with the Court. If you do so, the demand must be in writing and must be served upon the person signing this Summons. Within fourteen (14) days after you serve your demand, Plaintiff must file this lawsuit with the Court, or the service on you of this Summons and Complaint will be void.

6. If you wish to seek the advice of a lawyer in this matter, you should do so promptly so that your written response, if any, may be served on time.

7. This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 3rd day of January, 2023.

ROMERO PARK P.S.

H. Troy Romero, WSBA #19044
155 – 108th Avenue NE, Suite 202
Bellevue, WA 98004
(425) 450-5000 telephone
(425) 450-0728 facsimile
tromero@romeropark.com
Attorneys for Plaintiff

SUMMONS - 2

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA 98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 29 of 33

1
2
3
4
5
6
7

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

8
9
10

CHRISTOPHER WALKER, an individual,

                              Plaintiff,

                v.

DANIEL L. BARNETT and SHERRI MILLER
BARNETT, and the marital community
comprised thereof; AVIARA CAPITAL
PARTNERS, LLC, a California limited liability
company, HEALTH PROFESSIONALS
ALLIANCE, a Delaware Corporation; BE
HOLDINGS, LLC, an Oregon limited liability
company; BE CAPITAL PARTNERS LLC, an
Oregon limited liability company.

                              Defendants.

Case No.

SUMMONS

11
12
13
14
15
16
17
18
19
20
21

TO THE DEFENDANT DANIEL L. BARNETT:

22
23

1. A lawsuit has been started against you in the above-entitled court by Plaintiff.

2. Plaintiff's claims are stated in the written Complaint, a copy of which is served upon you with this Summons.

3. In order to defend against the lawsuit, you must respond to the Complaint by stating your defense in writing, and by serving a copy upon the lawyer signing this Summons within twenty (20) days after the service of this Summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where Plaintiff is entitled to what is asked for because you have not responded.

24
25
26
27
28
29
30

SUMMONS - 1

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 30 of 33

4. If you serve a Notice of Appearance on the undersigned lawyer, you are entitled to notice before a default judgment may be entered.

5. If not previously filed, you may demand that Plaintiff file this lawsuit with the Court. If you do so, the demand must be in writing and must be served upon the person signing this Summons. Within fourteen (14) days after you serve your demand, Plaintiff must file this lawsuit with the Court, or the service on you of this Summons and Complaint will be void.

6. If you wish to seek the advice of a lawyer in this matter, you should do so promptly so that your written response, if any, may be served on time.

7. This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 3rd day of January, 2023.

ROMERO PARK P.S.

H. Troy Romero, WSBA #19044
155 – 108th Avenue NE, Suite 202
Bellevue, WA  98004
(425) 450-5000 telephone
(425) 450-0728 facsimile
tromero@romeropark.com
Attorneys for Plaintiff

SUMMONS - 2

ROMERO PARK P.S.
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 31 of 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING**

| | |
|---|---|
| CHRISTOPHER WALKER, an individual, | Case No. |
| Plaintiff, | |
| v. | SUMMONS |
| DANIEL L. BARNETT and SHERRI MILLER BARNETT, and the marital community comprised thereof; AVIARA CAPITAL PARTNERS, LLC, a California limited liability company, HEALTH PROFESSIONALS ALLIANCE, a Delaware Corporation; BE HOLDINGS, LLC, an Oregon limited liability company; BE CAPITAL PARTNERS LLC, an Oregon limited liability company. | |
| Defendants. | |

TO THE DEFENDANT SHERRI MILLER BARNETT:

  1. A lawsuit has been started against you in the above-entitled court by Plaintiff.

  2. Plaintiff's claims are stated in the written Complaint, a copy of which is served upon you with this Summons.

  3. In order to defend against the lawsuit, you must respond to the Complaint by stating your defense in writing, and by serving a copy upon the lawyer signing this Summons within twenty (20) days after the service of this Summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where Plaintiff is entitled to what is asked for because you have not responded.

SUMMONS - 1

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ✦ Fax: (425) 450-0728

Exhibit 1
Page 32 of 33

4. If you serve a Notice of Appearance on the undersigned lawyer, you are entitled to notice before a default judgment may be entered.

5. If not previously filed, you may demand that Plaintiff file this lawsuit with the Court. If you do so, the demand must be in writing and must be served upon the person signing this Summons. Within fourteen (14) days after you serve your demand, Plaintiff must file this lawsuit with the Court, or the service on you of this Summons and Complaint will be void.

6. If you wish to seek the advice of a lawyer in this matter, you should do so promptly so that your written response, if any, may be served on time.

7. This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 3rd day of January, 2023.

ROMERO PARK P.S.

H. Troy Romero, WSBA #19044
155 – 108th Avenue NE, Suite 202
Bellevue, WA  98004
(425) 450-5000 telephone
(425) 450-0728 facsimile
tromero@romeropark.com
Attorneys for Plaintiff

SUMMONS - 2

**ROMERO PARK P.S.**
155-108th Avenue N.E., Suite 202
Bellevue, WA  98004-5901
Tel: (425) 450-5000 ◆ Fax: (425) 450-0728

Exhibit 1
Page 33 of 33